IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| SEAN ROBINSON<br>1852 Bryan St., NE<br>Washington, D.C. 20018<br><br>and<br><br>ADA HARRIS<br>2502 14th St., NE, Apt. 3<br>Washington, D.C. 20018<br><br>              Plaintiffs,<br>v.<br><br>BRANDON HARDY<br>c/o PChange, Inc.<br>8181 Professional Place, Suite 150<br>Hyattsville, MD 20785<br><br>and<br><br>SPECIAL POLICE OFFICER JOHN DOE<br>Identity and address unknown[1]<br><br>              Defendants. | JURY TRIAL DEMANDED<br><br>Civil Action No. 19-cv-03070 |

## COMPLAINT

### INTRODUCTION

1.  On October 15, 2017, two Special Police Officers ("SPOs")—private security officers who have been granted arrest powers by the District of Columbia—burst into the apartment of Plaintiff Ada Harris and attacked and arrested her guest, Plaintiff Sean Robinson. The entry, assault, and arrest were unlawful and in violation of Ms. Harris's and Mr. Robinson's constitutional rights.

---

[1] The exact identity of Defendant DOE is unknown. Concurrent with the filing of this Complaint, Plaintiffs are moving this Court to allow them to subpoena PChange, Inc. and Defendant Hardy for his identity.

1

2. SPOs are private security guards who, with minimal training and the payment of $400.00, can obtain a commission in the District of Columbia to arrest and even to carry weapons. They are charged with enforcing the private interests of their employers.

3. In this case, the SPOs were commissioned to enforce the private interests of Brookland Manor, an apartment complex in northeast Washington, DC, which is the property where Ms. Harris lives. In breaking into Plaintiff Ada Harris's home to arrest Plaintiff Sean Robinson, they alleged that they were enforcing a barring notice— a unilateral declaration by the property manager or owner that an individual may not enter on the property. It is not a court order.

4. No barring notice had been issued against Mr. Robinson preventing him from entering Brookland Manor.

5. In arresting Mr. Robinson for violating the non-existent barring notice, the SPOs terrorized plaintiffs, damaged the apartment, and assaulted and pepper sprayed Mr. Robinson, ultimately leaving him handcuffed, shirtless, and in pain on the curb outside. Ms. Harris was terrified for her own safety and the safety of her guest, made to feel unsafe in her home, and embarrassed in front of her neighbors.

### SPECIAL POLICE OFFICERS AND BROOKLAND MANOR

6. A "Special Police Officer" is an individual appointed under §5-129.02 of the District of Columbia Code. Special Police Officers are subject to the requirements of Chapter 11 of Title 6A of the District of Columbia Municipal Regulations. DC Code § 47-2839.01(5).[2]

---

[2] Throughout, §6A1100 refers to the appointment authority in DC Code §4-114(1981). This code section reference appears to be out of date. DC Code §4-114 relates to the power of the Mayor over dependent children. It appears that these references should be to DC Code § 5-129.02

7. DC Code §5-129.02(a) authorizes the Mayor to appoint special police officers to police a particular property of a corporation or individual, provided that the SPOs be paid wholly by the corporation or person on whose account their appointments are made.

8. A Special Police Officer has arrest authority for offenses committed within the jurisdiction to which his commission extends, e.g., on the property the SPO was hired to protect. DC Code §23-582

9. SPOs are subject to the same rules as those that govern officers of DC's Metropolitan Police Department ("MPD").  DC Reg. §6A1100.6

10. The SPOs who broke into Ms. Harris's home and attacked and arrested Mr. Robinson were commissioned to protect the property of Brookland Manor.

11. Brookland Manor had contracted with PChange, Inc. to provide security for the complex.

12. PChange, Inc. employed both SPOs on October 15, 2017.

13. Brookland Manor's owners intend to redevelop the property, which is located in a rapidly gentrifying area.   Over the past two years, tenants have publicly complained that "policing" activities conducted by SPOs, such as the excessive force directed at plaintiffs form part of an overall effort that appears designed to force out existing residents.  *See* Pete Rodrigue, *"We're already in jail:" Evictions and Private Policing at Brookland Manor,* Greater Greater Washington (May 19, 2017).  https://ggwash.org/view/63489/were-already-in-jail-evictions-and-private-policing-at-brookland-manor; Terrence McCoy, *As the nation's capital booms, poor tenants face eviction over as little as $25*, The Washington Post (Aug. 8, 2016), https://www.washingtonpost.com/sf/local/2016/08/08/as-the-nations-capital-booms-poor-

tenants-face-eviction-over-as-little-as-25/?noredirect=on&utm_term=.4f53b6a9e0dc (recounting measures at Brookland Manor).

14. SPOs at Brookland Manor punish residents for minor actions and/or breach of "rules" established by the property's owner and/or management, such as leaning on a fence while waiting for a child at a bus stop, being present or playing on green space surrounding the buildings, or talking with other residents on the open walkways.

15. Members of Brookland Manor staff view videos of the property and direct SPOs to respond to the types of minor rule violations set forth in paragraph 14.

16. On information and belief, as part of this effort, barring notices are issued against residents' visitors, including friends and relatives of residents of Brookland Manor, and are told to strictly enforce them. For example, SPOs told a visitor that he would get a barring notice for sitting on a stoop.

17. Brookland Manor residents and their guests, including Ms. Harris and Mr. Robinson, have the constitutional right under the Fourth Amendment to the quiet enjoyment of their homes, without suffering the actions of hostile private guards who enter their apartments without cause and subject them to unjustified physical force, damaging their persons and their property. In this case, the SPOs lacked legal authority to enter Ms. Harris's apartment home, to use force against Mr. Robinson, to damage Ms. Harris's apartment, and to enter to arrest Mr. Robinson.

18. Plaintiffs bring this lawsuit in order to vindicate their Fourth Amendment rights to be free from unwarranted intrusion into the privacy of their home and from excessive force being used against them. They seek damages to compensate Ms. Harris and Mr. Robinson for their injuries and to ensure that SPOs act within the limits of their authority and the Constitution.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction to hear this complaint pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

20. Venue lies in this Court pursuant to 28 U.S.C. § 1931(b)(2) because the events or omissions giving rise to the claims occurred in the District of Columbia.

## PARTIES

21. Plaintiff ADA HARRIS is the leaseholder for the home in which she lives at Brookland Manor. She is a resident of the District of Columbia.

22. Plaintiff SEAN ROBINSON is a childhood friend of Plaintiff Harris and was an invited guest in Ms. Harris's residence in Brookland Manor when the incidents described herein occurred. He is a resident of the District of Columbia.

23. Defendant Special Police Officer BRANDON HARDY was commissioned as a SPO by the District of Columbia to protect property at Brookland Manor.

24. By virtue of his commission as an SPO to protect the property of Brookland Manor, Mr. Hardy possessed state authority to arrest for offenses committed on the property of Brookland Manor. DC Code §23-582. Mr. Hardy was acting under color of state law, as that term is used pursuant to 42 U.S.C. § 1983, when he entered the apartment of Plaintiff Ada Harris to arrest Plaintiff Sean Robinson, and when he arrested and used force against Plaintiff Sean Robinson.

25. Upon information and belief, Defendant SPECIAL POLICE OFFICER JOHN DOE ("DOE") was commissioned as an SPO by the District of Columbia to protect property at Brookland Manor. At this time his identity is not known to Plaintiffs.

26. By virtue of his commission as an SPO to protect the property of Brookland Manor, DOE possessed state authority to arrest for offenses committed on the property of Brookland Manor. DC Code §23-582. DOE was acting under color of state law, as that term is used pursuant to 42 U.S.C. § 1983, when he entered the apartment of Plaintiff Ada Harris to arrest Plaintiff Sean Robinson, and when he arrested and used force against Plaintiff Sean Robinson.

## FACTS

### A. Defendant Brandon Hardy and Doe's Unlawful Entry and Use of Force

27. Ada Harris ("Ms. Harris") resides and lives at Brookland Manor, where she leases a two bedroom apartment. The apartment is Ms. Harris's home, in which she maintains a legitimate expectation of privacy.

28. Sean Robinson ("Mr. Robinson") has been close friends with Ms. Harris for nearly thirty years, since they were schoolchildren together. They are like family to one another. Mr. Robinson visits Ms. Harris at her home frequently, often about three or four times per week. He was born and raised in Brookland Manor.

29. October 15, 2017 was Ms. Harris's birthday. She had invited Mr. Robinson to her home on this occasion to share time, food, and friendship together.

30. Mr. Robinson, as Ms. Harris's welcome, regular guest, had a legitimate expectation of privacy within her apartment.

31. Mr. Robinson arrived to Ms. Harris's apartment at approximately 4 p.m.

32. At approximately 5 p.m., Mr. Robinson stepped outside to go to an ice cream truck that was parked on 14th Street in front of Brookland Manor to purchase a soda.

33. When he was outside, Mr. Robinson passed by and observed the Defendants who were talking to two MPD officers.

34. MPD officers at the scene included Officer Shebli and Officer Brooks. Officer Brooks was familiar to Mr. Robinson because Officer Brooks lived at Brookland Manor and knew Mr. Robinson personally.

35. After purchasing his soda, Mr. Robinson returned to Ms. Harris's apartment without notable event or incident, shutting the apartment door behind him.

36. Ms. Harris was also in the apartment at this time, in her bedroom, getting dressed to go out for her birthday.

37. Mr. Robinson was sitting at a table eating. The table was visible from the front doorway once the door was opened.

38. The door to the apartment was closed and unlocked.

39. Minutes after Mr. Robinson returned to Ms. Harris's apartment, Mr. Hardy and DOE entered the apartment without knocking, announcing themselves, or seeking consent from Ms. Harris or any other person before entering.

40. Ms. Harris was in her bedroom when Mr. Hardy and DOE entered her apartment.

41. Upon entering the apartment, Mr. Hardy and DOE quickly looked around the apartment and immediately moved towards Mr. Robinson.

42. Mr. Robinson was not engaged in any unlawful conduct when Mr. Hardy and DOE entered Ms. Harris's apartment. He was simply sitting at the table eating.

43. Mr. Hardy and DOE violently grabbed Mr. Robinson and attempted to handcuff him.

44. Ms. Harris heard Mr. Hardy and DOE's forcible intrusion and commotion and came out of her bedroom. She saw the two SPOs physically assaulting and seizing Mr. Robinson.

45. Ms. Harris told Mr. Hardy and DOE that the premises were her apartment and urgently asked what was going on. Neither Mr. Hardy nor DOE responded to her. Neither Mr. Hardy nor DOE explained to Ms. Harris and Mr. Robinson the basis for their actions.

46. Mr. Robinson, shocked and frightened by the violent and painful approach of Mr. Hardy and DOE, and without any explanation as to what was happening to him, tried to go to the door to reach the MPD officers outside.

47. Mr. Hardy grabbed Mr. Robinson's wrist as Mr. Robinson tried to go to the door.

48. After Mr. Hardy grabbed his wrist, DOE grabbed Mr. Robinson and put him in a chokehold, restricting his ability to breathe.

49. Mr. Hardy put his foot on the door to prevent Mr. Robinson from opening it. This action broke the doorknob off of Ms. Harris's door.

50. While holding Mr. Robinson in a chokehold, DOE also violently elbowed the wall of Ms. Harris's apartment, leaving a hole.

51. Mr. Robinson struggled to get out of DOE's chokehold. Finally, Mr. Robinson was able to break free again. He ran outside of Ms. Harris's apartment towards the uniformed MPD officers.

52. As Mr. Robinson ran towards the MPD officers on 14th Street, DOE chased after him and jumped on his back, throwing him to the ground. During DOE's assault, Mr. Robinson's shirt was torn off of his body.

53. After jumping on Mr. Robinson, DOE began to handcuff Mr. Robinson as he lay face down on the ground.

54. On the ground, Mr. Robinson was not struggling and his hands were behind his back.

55. While DOE was handcuffing him, Mr. Hardy walked from Ms. Harris's apartment towards Mr. Robinson who was on the ground, subdued.

56. Without warning or provocation, Mr. Hardy then sprayed a chemical weapon directly into each of Mr. Robinsons' eyes. On information and belief, the chemical weapon was extraction of oleoresin capsicum spray ("OC spray").

57. The MPD officers, whom Mr. Robinson had seen earlier, ran over when they saw Mr. Hardy discharging pepper spray into Mr. Robinson's eyes. Approximately ten other MPD officers also approached in patrol cars or on foot.

58. Mr. Hardy and DOE placed Mr. Robinson, in handcuffs, on the curb outside of Ms. Harris's apartment building.

59. Mr. Hardy and DOE left Mr. Robinson without his shirt in public view on the curb with his face burning from the effects of pepper spray.

60. As soon as Mr. Robinson was placed on the curb, residents of Brookland Manor came outside and began gathering. They urged the assembled police to provide Mr. Robinson with water to flush his eyes to ease the painful burning that he was evidently suffering.

61. Neither Mr. Hardy nor DOE, nor any MPD officer, got water or flushed Mr. Robinson's eyes, despite the urgent requests of those nearby and despite Mr. Robinson's evident suffering.

62. After a lengthy period without flushing or care provided by MPD, a Brookland Manor resident, and friend of Mr. Robinson's, brought water for him. He gave it to the MPD officers around Mr. Robinson and asked them to flush his eyes from the pepper spray.

63. The MPD officers called an ambulance for Mr. Robinson. When the ambulance arrived, Mr. Robinson remained handcuffed while emergency personnel examined him for injuries and finally flushed his eyes. Officers did not remove his handcuffs until about fifteen minutes after the ambulance arrived.

64. Mr. Robinson was then taken to MedStar Washington Hospital Center at 110 Irving St NW, Washington, DC 20010.

65. Mr. Robinson was treated with an eye wash and released from the hospital at about 8:00 pm.

66. OC spray is an inflammatory agent. It causes an almost immediate swelling of the eyes and breathing passages. Additionally, it causes an intense burning sensation of the eyes, throat, and sprayed areas of the skin. It results in profuse tearing and loss of vision. When OC spray is inhaled, the respiratory tract becomes inflamed and restricts breathing. OC spray may also cause involuntary closing of the eyes, coughing, choking, loss of coordination and upper body strength, nausea, disorientation, and fear. *See* MPD General Order 901.04 Oleoresin Capsicum Spray Dispensers.

67. MPD policy requires that, before using OC spray on someone, officers must warn the person the officer is going to use OC spray against them, and give them a reasonable period of time after the warning to comply. *Id.*

68. MPD policy prohibits officers from spraying OC spray at a person from a distance of less than three feet, unless absolutely necessary. *Id.*

69. Under MPD policy, after officers spray someone with OC Spray, officers must allow the person the opportunity to wash the affected area within 20 minutes of being sprayed, absent exceptional circumstances. *Id.*

70. As a consequence of the aforementioned actions, Mr. Robinson sustained physical injuries, including significant burning pain from being sprayed in the eyes with OC, difficulty breathing, vomiting and as several scratches from his altercation with Mr. Hardy and DOE.

**B. The False Justification for the Unlawful Entry: A Non-existent "Barring Notice"**

71. The belated reason Mr. Hardy and DOE gave for entering Ms. Harris's apartment, without consent or legal authority, was that they were enforcing a barring notice.

72. The U.S. Attorney's Office and the Office of the DC Attorney General have approved a "barring" notice that the MPD may serve. Among other things, the notice is designed to ensure that it is served on the correct person. It requires specific identification of the person to whom it is directed, the property from which the person is "warned to stay off," personal information designed to ensure that the right person is served (including method of identification, nickname, personal characteristics, identifying marks, employment, social security number and phone and address). The notice is to contain a reason for its issuance and a signature (or indication of signature refusal) of the individual to whom the notice is directed.

73. Mr. Hardy and DOE took no steps to confirm whether a barring notice existed regarding Mr. Robinson.

74. Neither Mr. Hardy nor DOE had a copy of a barring notice with them when they entered Ms. Harris's apartment.

75. Enforcement of a barring notice without the notice itself violates MPD procedure, to which SPOs such as Mr. Hardy and DOE are required to adhere. MPD Cir-12-01 IV.A.

76. There was no barring notice prohibiting Plaintiff Sean Robinson from entering the property of Brookland Manor.

77. Mr. Hardy and DOE lacked lawful authority to enter Ms. Harris's apartment to arrest her guest, irrespective of whether they had a proper barring notice.

78. At some time after Mr. Robinson was confined to the curb, the SPOs' supervisor arrived with paperwork, including a barring notice for someone other than Mr. Robinson.

79. The supervisor showed the barring notice to the MPD officers, who asked to see Mr. Robinson's identification.

80. Upon review of Mr. Robinson's identification, the supervisor said to Mr. Hardy and DOE words to the effect of: "You got the wrong person. That's not him."

81. In response to the supervisor's comment that they had misidentified Mr. Robinson as the target of a barring notice, Mr. Hardy or DOE said, "We in the wrong," or words to that effect. The other responded, "No, you in the wrong." He added, "You outrank me. You told me to go in the apartment with you."

82. One of the MPD officers stated to Mr. Hardy and DOE that MPD does not go into people's apartments without a warrant.

83. One of the MPD officers also asked Mr. Hardy and DOE why they did not say anything to the MPD Officer about Mr. Robinson when he had walked past them when he went to and returned from the ice cream truck.

84. In response to the MPD admonition that a warrant is required to enter a resident's apartment, Mr. Hardy or DOE told Officer Brooks that their employer instructed them that, when there is a barring notice, they can "go after them" and enter apartments.

85. Both Mr. Hardy and DOE admitted to the MPD that their actions were based on mistaken and unascertained identity. The MPD police report for the incident recounts that Mr. Hardy and DOE conceded that Mr. Robinson "was not the person they thought he was."

### C. The Traumatizing Impact of Defendants' Actions

86. As a consequence of the conduct of Mr. Hardy and DOE, both Mr. Robinson and Ms. Harris suffered emotional trauma.

87. Mr. Robinson felt humiliated, violated, and disrespected.

88. Ms. Harris felt very angry about the violation of her home and visiting friend, Mr. Robinson. She also felt scared because this was happening when neither she nor Mr. Robinson had done anything to warrant the behavior exhibited by Mr. Hardy and DOE.

89. Both Ms. Harris and Mr. Robinson continue to find themselves emotionally and mentally affected by the actions of Mr. Hardy and DOE. They both try to avoid the SPOs at Brookland Manor because they do not know how they will behave towards them. They are frightened around the SPOs and are constantly making sure they are not doing anything that could draw attention to themselves or give the SPOs a reason to approach them. Ms. Harris does not feel safe in her own home because of how the SPOs acted.

90. Before this incident, Ms. Harris felt that she could seek the assistance of the SPOs if she had a problem or felt unsafe in her home. Now, she would not trust them enough to ask for help even if there were a legitimate threat or problem at Brookland Manor.

91. Mr. Robinson believes that the SPOs will target him and does not feel safe around them. He thinks about how the SPOs treated him almost every day. Even now, he feels upset and violated when he remembers what happened.

## COUNT I

**Unconstitutional Warrantless Entry and Search of Home**
**Fourth Amendment; 42 U.S.C. § 1983**
**Claims asserted by Ada Harris and Sean Robinson against Brandon Hardy and DOE**

92. Paragraphs 1-91 are incorporated by reference as if set forth herein.

93. By entering Ms. Harris's apartment without her consent or other legal authority, Mr. Hardy and DOE violated her reasonable expectation of privacy.

94. As a welcomed, regular, and invited guest in Ms. Harris's home, Mr. Robinson possessed a reasonable and legitimate expectation of privacy, and was entitled to protection against unreasonable searches and seizures in the home of his host. The intrusion and subsequent search and seizure violated Mr. Robinson's reasonable expectation of privacy.

95. The entry into Ms. Harris's apartment and the ensuing search of Mr. Robinson violated both plaintiffs' Fourth Amendment rights.

96. As a result of the conduct set forth in paragraphs 1 to 91, *supra*, plaintiffs suffered damages.

97. At all times relevant to this Complaint, and with respect to all of the acts alleged herein, Mr. Hardy and DOE acted under color of state law.

98. Defendants Mr. Hardy and DOE acted with reckless indifference or callous disregard for Plaintiffs' rights to be free from unlawful and unreasonable entry, search and seizure, thus entitling plaintiffs to punitive damages.

**COUNT II**
**Excessive Force**
**Fourth Amendment; 42 U.S.C. § 1983**
**Claims asserted by Sean Robinson against Brandon Hardy and DOE**

99. Paragraphs 1 - 91 are incorporated by reference as if set forth herein.

100. There was no probable cause to arrest Mr. Robison or to seize his person through use of force.

101. The excessive forced used against Mr. Robinson included, but is not limited to, the spraying of pepper spray into each of Mr. Robinson's eyes, at a time when he was under police control, constituted unconstitutional conduct.

102. The use of force by defendants Mr. Hardy and DOE against Mr. Robinson was excessive and unreasonable in violation of the Fourth Amendment to the U.S. Constitution.

103. Defendant Officers Mr. Hardy and DOE acted with reckless indifference or callous disregard for Plaintiff Robinson's right to be free from unlawful and unreasonable use of force, thus entitling him to punitive damages.

### COUNT III
### Unlawful Arrest
### Fourth Amendment; 42 U.S.C. § 1983
### Claims asserted by Sean Robison against Brandon Hardy and DOE

104. Paragraphs 1 - 91 are incorporated by reference as if set forth herein.

105. Mr. Robinson was under arrest and was not free to leave from the moment Defendants Mr. Hardy and DOE used force to seize Mr. Robinson.

106. Defendants Mr. Hardy and DOE, independently and jointly, arrested Mr. Robinson without probable cause that he had committed a crime, in violation of the Fourth Amendment to the U.S. Constitution.

107. Defendant Officers Mr. Hardy and DOE acted with reckless indifference or callous disregard for Plaintiff Robinson's right to be free from unlawful arrest, thus entitling him to punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant the following relief:

    a. Entry of a declaratory judgment that the conduct described herein constitutes a violation of the Fourth Amendment to the U.S. Constitution;

    b. Award compensatory damages to Plaintiffs;

c. Award Plaintiffs punitive damages in an amount that would punish Defendants for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

d. Award Plaintiffs reasonable attorneys' fees and costs and expenses pursuant to 42 U.S.C. § 1988 and any other applicable statutes or rules or laws; and

e. Grant any further relief that this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues in this action that are so triable.

Dated October 15, 2019                                      Respectfully submitted,

  /s/ Dennis A. Corkery
Hannah Lieberman (D.C. Bar No. 336776)
Dennis A. Corkery (D.C. Bar No. 1016991)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS
700 14th St., NW, Suite 400
Washington, DC 20005
T: (202) 319-1000
F: (202) 319-1010
Hannah_Lieberman@washlaw.org
Dennis_Corkery@washlaw.org

*Counsel for Plaintiffs*